# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                                                    In Proceedings
                                                          Under Chapter 7
JERRY RAY JOHNSON,
DARLA KAY JOHNSON,
                                                          Case No. 13-40605
                Debtor(s).

<u>OPINION</u>

A dispute has arisen between the chapter 7 trustee and the debtors over whether certain property belonging to the debtors is property of the bankruptcy estate that must be turned over to the trustee.  The initial inquiry raised by the trustee's motion for turnover involves whether Jerry Johnson's "working interest" in an oil well, and the revenue received upon sale of extracted oil, is property of the bankruptcy estate or income to the debtors.  A second inquiry focuses on whether property held in a trust belongs to the bankruptcy estate.   A last inquiry addresses whether equitable considerations may govern the Court's determination as to the other two issues before it.

<u>Oil and Gas Working Interest</u>

The trustee seeks turnover of all indicia of debtor Jerry Johnson's $^{11}/_{32}$nds "working interest" in an oil well, and of all the revenue received by Jerry Johnson from that oil well since the commencement of the chapter 7 case on May 30, 2013.  According to the trustee, the "working interest" is an interest in real estate and the extracted oil and the funds produced from the extracted oil are proceeds of that real estate interest.  The debtors dispute the trustee's analysis that Jerry Johnson's "working interest" is realty.  They concede that the "working

interest" is personal property,[1] yet contend that it is a contractual right to payment that must be treated as income and, therefore, is protected from the trustee's reach.

The following facts are not in dispute.  On March 5, 1980, Raymond W. Clayton entered into an Agreement pursuant to which he became the lessee and operator under an oil and gas lease of indefinite duration (Clayton Lease).  On September 3, 1982, Raymond Clayton d/b/a Clayton Enterprises entered into an Agreement and Receipt calling, among other things, for Raymond Clayton, as Operator, to drill a well for oil and gas exploration and for Jerry Johnson, as an Interest Holder, to pay Raymond Clayton a sum of money to complete the well if it appeared productive.  Under this Agreement and Receipt, at ¶ 6, Raymond Clayton, as operator, expressly "reserve[d] the right to operate and manage the said premises herein in behalf of all INTEREST HOLDERS."  On November 27, 1982, Raymond W. Clayton d/b/a Clayton Enterprises assigned a $5/16$ "working interest" in the Clayton Lease to Jerry Johnson.  On August 14, 1985, Cecil D. Karnes and Bobbie A. Karnes assigned a $1/32$ "working interest" in the same oil and gas lease to Jerry Johnson.  There is no indication from the documents of record that Jerry Johnson is a lessee or operator under an oil and gas lease.  Rather, the documents reflect that he became an "Assignee" under each "Assignment Oil and Gas Lease."

On June 7, 2012, the debtors filed a chapter 13 case in this District which was dismissed on February 4, 2013, without a confirmed plan.  The debtors contend that during the course of the chapter 13 case, they were allowed to keep the income derived from Jerry Johnson's working interest in the oil and gas lease.

---

[1]   The debtors have admitted that the "working interest" is personal property by listing it as such on Schedule B.  In argument as well, they expressly admit that extracted oil is personal property under state law.  Debtors state in their brief  that "[m]inerals (and by logical inference, money due from minerals) following extraction constitute personal property under State law and are definable as 'goods.'  Once oil and gas are extracted, they are personalty and laws even [sic] of security interest apply."  Debtors' Brief, document 60, at 3-4 (citations omitted).

On May 30, 2013, the debtors filed the instant chapter 7 case.  On their schedule of personal property, Schedule B, the debtors listed Jerry Johnson's oil interest as follows:

> Approximately 34% ($^{11}/_{32}$nds) of working oil well
> Operated by Bi-Petro[2]
> Receives $924.45/month income[3]

The debtors have provided no evidence to show that the income at issue is earnings from services performed by either of them after the commencement of the bankruptcy case.

While the Bankruptcy Code, 11 U.S.C. § 541(a), sets the parameters of what property is included in the bankruptcy estate, the nature of an interest in property is defined by state law. *E.g., In re Chenoweth,* 132 B.R. 161, 164 (Bankr. S.D. Ill. 1991) *aff'd,* 143 B.R. 527 (S.D. Ill. 1992) *aff'd,* 3 F. 3d 1111 (7th Cir. 1993).  This Court has previously held that, in Illinois, oil and gas interests have a hybrid character involving both real and personal property components.  *In re Fullop*, 125 B.R. 536, 539 (Bankr. S.D. Ill. 1990) *aff'd*, 133 B.R. 627 (S.D. Ill. 1991) *aff'd as modified, Matter of Fullop,* 6 F.3d 422 (7th Cir. 1993).  In *Fullop*, this Bankruptcy Court found:

> As a general rule in Illinois, oil and gas in place constitutes land or real estate and belongs to the owner of the land so long as it remains under the land. *Miller v. Ridgley,* 2 Ill. 2d 223, 117 N.E. 2d 759 (1954); see 26 I.L.P. *Mining, Oil, and Gas*, §12 (1956). An Illinois oil and gas lease, while not granting title to the oil itself, grants to the lessee the right to enter upon the surface of the land and to reduce the oil and gas to the lessee's possession. *Ohio Oil Co. v. Daughetee*, 240 Ill. 361, 88 N.E. 818 (1909). Because such a lease concerns the right to oil prior to extraction, Illinois courts classify an oil and gas leasehold as a freehold or real estate interest subject to real estate law. *In re Hanson Oil Co., Inc.*, 97 B.R. 468 (Bankr. S.D. Ill. 1989).
>
> Once oil reaches the surface and is reduced to possession, it is considered personalty and its sale and disposition is governed by personal property law. *Palumbo v. Harry M. Quinn, Inc.*, 323 Ill.App. 404, 55 N.E. 2d 825 (1944); *see Nation Oil Co. v. R.C. Davoust Co.*, 51 Ill.App. 2d 225, 201 N.E. 2d 260 (1964): oil pumped out of the ground and stored in tanks is personal property. Thus, while

---

[2] The Bi-Petro division order states that the operator of the lease is Clayton Enterprises.
[3] On Schedule I, the debtors state that they receive "Oil Well Net Proceeds" of $493.00 monthly.

3

an oil and gas lease itself conveys a real property interest, transactions concerning oil after extraction involve personal property interests subject to rules of personal property law.

*Id.*

The parties to this dispute agree that Jerry Johnson was assigned a $^5/_{16}$ "working interest" and later a $^1/_{32}$ "working interest" in the oil and gas lease operated by Raymond Clayton as lessee under the 1980 conveyance. The nature of that interest, and whether it is property of the bankruptcy estate, however, remains in contest. Neither party has clarified for the Court, by reference to the documents of record, what property interest was conveyed to Jerry Johnson by virtue of the assignments. The phrase "working interest" can be amorphous, taking its shape from the context in which it arises. When the phrase describes a lessee's interest as the operator under an oil and gas lease, the term "working interest" includes rights to enter upon the land, to drill the well, to place storage tanks and to pump oil.[4] These rights to enter upon and use the land for oil exploration and production constitute the real estate component of an oil and gas freehold interest. *Matter of Fullop,* 6 F.3d at 425. In contrast, the term has a narrower meaning when a lessee/operator assigns a fractional "working interest" under an oil and gas lease, as is the case here. "The phrase 'working interest' in an assignment of a fractional working interest under

---

[4]  In the context of a lessee/operator performing under an oil and gas lease conveyed by the owner of the mineral estate, the Seventh Circuit in *Matter of Fullop* defined the term "working interest" as follows:

> Under Illinois law, a fee simple in real property consists of both a mineral estate and a surface estate, which may be severed from each other. *Jilek v. Chicago, Wilmington & Franklin Coal Co.*, 382 Ill. 241, 47 N.E.2d 96, 98 (Ill. 1943). The owner of the mineral estate may lease that property right to another for the purposes of exploration and production of oil and gas. The lessee is responsible for the work necessary to produce oil—such as drilling the well, pumping any oil located, and providing storage tanks. The lessee's rights under the oil and gas lease are known as a 'working interest.' *Illinois Nat. Oil & Gas Co. v. Sinclair*, 373 Ill. 581, 27 N.E.2d 450, 451 (Ill.1940). The working interest includes 'the portion of the oil and gas that may be produced from the premises after the royalty for the share paid to the landlord is first deducted.' *Bates v. Mansfield*, 212 Ill.App.3d 69, 156 Ill.Dec. 73, 75, 570 N.E.2d 549, 551 (1991).

6 F.3d 422, 425 (7th Cir. 1993).

4

an oil and gas lease has the accepted meaning in the oil industry as the assigning of the fractional portion of the oil and gas produced from the premises, after the royalty for the share paid to the lessor is first deducted." Monica C. M. Leahy, *Assignment of Lease; Transfer*, 26 ILLINOIS LAW AND PRACTICE *Mining, Oil & Gas* § 64 (Thomson Reuters May 2014) (citations omitted) (*database available on Westlaw*).

The Court finds that a freehold interest in real estate was not assigned to Jerry Johnson because none of the documents of record reveal that Mr. Johnson was granted the rights "to enter upon the surface of the land and to reduce the oil and gas to [his] possession," *In re Fullop*, 125 B.R. at 539, that is the *sine qua non* of a freehold estate in oil and gas.[5]   Raymond Clayton expressly reserved the rights to operate and manage the premises for himself in the Agreement and Receipt and the trustee has pointed to nothing in the documents of record to show otherwise. Based on the accepted usage of the phrase as well, the Court concludes that Jerry Johnson's "working interest" does not include a real estate component.   Having determined that Jerry Johnson does not have a freehold interest by virtue of the conveyances to him, the Court need not revisit the question posed by the trustee of whether the extracted oil and the profits from its sale constitute a proceed or product of the real estate interest.[6]

The Court turns next to the nature of the debtor's personal property interest in the oil and gas assignment.  In this regard, Illinois law is conclusive that an oil and gas lease of indefinite duration—as is the case here—does not confer title of the oil and gas upon the lessee while the oil and gas remain in the ground.  Title does not transfer from the lessor to the lessee until the oil

---

[5] A freehold interest does not impart title to the oil and gas in place but rather grants to the lessee only the right to enter upon the surface of the land and to reduce the oil and gas to the lessee's possession. *Id.; In re Hanson Oil Co., Inc.,* 97 B.R.468, 469-70 (Bankr. S.D. Ill. 1989).

[6] This Court has determined previously that extracted oil, and the profits from its sale, does not constitute a proceed or product of the real estate interest but rather is personal property. *In re Prior*, 176 B.R. 485, 491, 497-98 (Bankr. S.D. Ill. 1995) (no longer good law on an unrelated point of law).

and gas are found and in the possession of the lessee.   As explained in a well known

encyclopedia of Illinois law,

> an oil and gas lease granting the right to enter and occupy premises for the
> purpose of searching for oil and gas and reducing any oil and gas found to
> possession confers on the lessee a freehold estate or interest in the real estate if it
> is of indefinite duration.  However, such a lease does not work a severance of the
> oil and gas from the surface rights, nor does it grant or convey to the lessee any
> interest in the oil and gas in the ground, as title to it remains in the lessor until oil
> and gas is found and reduced to the lessee's possession.

26 ILLINOIS LAW AND PRACTICE *Mining, Oil & Gas* § 59, at 740-41 (West Group 2002)

(footnotes omitted).   As a result, the debtors are correct that Jerry Johnson has a personal

property interest in a commodity—oil and gas—that arises upon its removal from the ground

when it is reduced to the lessee's possession.

 But that is not the end of the matter.  Oil and gas leases, and assignments of fractional

interests in oil and gas leases, are contracts.  *See, e.g., Bi-County Properties v. Wampler,* 378

N.E. 2d 311, 314 (Ill. App. Ct. 1978); *Carter Oil Co. v. Dees,* 92 N.E. 2d 519, 522 (Ill. App. Ct.

1950); *Hein v. Shell Oil Co.,* 42 N.E. 2d 949, 951 (Ill. App. Ct. 1942).  *See also* 26 ILLINOIS LAW

AND PRACTICE *Mining, Oil & Gas* § 64, at 749 (footnote omitted) (contracts of assignment

determine the rights and liabilities between the assignors and assignees of oil and gas leases).   In

the case at hand, the assignments to Jerry Johnson gave him contractual rights to payments for

oil extracted in the future.  These contractual rights to payments are personal property under

Illinois law. *E.g., In re Prior,* 176 B.R. at 491 (extracted oil and rights to payments or "accounts"

arising from sale of the oil constitute personal property under Illinois' Uniform Commercial

Code); *In re Classic Coach Interiors, Inc.*, 290 B.R. 631, 635-36 (Bankr. C.D. Ill. 2002) *(citing

Marquette Nat. Bank v. B.J. Dodge Fiat, Inc.*, 475 N.E. 2d 1057, 1061-62 (Ill. App. Ct. 1985)).

Therefore, Jerry Johnson's personal property interest extends beyond his interest in oil extracted

pre-petition and its profits, to include his contractual rights to post-petition oil production and

accounts under the oil and gas assignments.

Having determined the characteristics of Jerry Johnson's oil and gas interest under state

law, the Court now must decide whether this interest is property of the bankruptcy estate.  As

discussed above, property of the estate is defined in § 541(a) of the Bankruptcy Code, which

states in pertinent part:

> (a)      The commencement of a case under . . . this title creates an estate.  Such
> estate is comprised of all the following property, wherever located and by
> whomever held:
>
> (1)      Except as provided in subsections (b) and (c)(2) of this section, all legal or
> equitable interests of the debtor in property as of the commencement of the case.
> . . .
>
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate,
> except such as are earnings from services performed by an individual debtor after
> the commencement of the case.

11 U.S.C. § 541(a).  The scope of estate property is defined most broadly to include "virtually all

property of the debtor" at the time the bankruptcy case is filed, *Matter of Yonikus,* 996 F. 2d 866,

869 (7th Cir. 1993) (no longer good law on an unrelated point of law).  In explaining the breadth

of the term, the Seventh Circuit has said:

> '[T]he term 'property' has been construed most generously and an interest is not
> outside its reach because it is novel or contingent or because enjoyment must be
> postponed'. . . A debtor's contingent interest in future income has consistently
> been found to be property of the bankruptcy estate . . . In fact, every conceivable
> interest of the debtor, future, nonpossessory, contingent, speculative, and
> derivative, is within the reach of § 541.

*Id.* (citations omitted).      Therefore, section 541(a) does not distinguish between realty and

personalty in capturing for the estate both legal and equitable interests of a debtor in property,

but those interests must exist as of the commencement of the bankruptcy case.  Because, in

Illinois, title to oil and gas passes to the lessee only when the oil and gas is found and reduced to possession, Mr. Johnson's interest in whatever oil and gas had been reduced to possession as of the commencement of the case became property of the estate at that time.  Pursuant to § 541(a)(6), that interest also included any profits earned or to be earned from the sale of the extracted oil unless the profits were the result of post-petition services performed by the debtors. 11 U.S.C. § 541(a)(6).

Mr. Johnson's working interest however, is more than merely an interest in a commodity—the extracted oil that exists as of the petition date—and in the profits from the sale of that commodity.  As to post-petition production, Mr. Johnson has contractual rights that flow into the bankruptcy estate.  *See*, *e.g., In re Resource Technology Corp.*, 254 B.R. 215, 220 (Bankr. N.D. Ill. 2000) (property of the estate includes any contract rights that a debtor possesses at the time of the bankruptcy filing).  While admitting that Jerry Johnson's working interest is a contractual right to payment, the debtors' principle argument appears to be that the resultant income he receives is excluded from the bankruptcy estate.  The debtors state their position as follows:

> The issue in regard to the 11/32nds working interest in the oil wells boils down to whether the interest is real estate or a contractual right to receive money. It if [sic] is a right to receive money, then that income, pursuant to the Debtors' meager income stream, would be theirs.

Although it is difficult to follow the debtors' arguments, seemingly they assert that a contractual right to receive future payments is not property of the estate because it is income.  This argument fails under § 541(a)(6) because "[a] post-petition payment on a pre-petition contractual interest belongs to the bankruptcy estate if the payment is neither attributable to nor conditioned upon the

debtor's post-petition services." *Longaker v. Boston Scientific Corp.*, 715 F. 3d 658, 661 (8th Cir.) *cert. denied,* 134 S. Ct. 537 (2013).

With the exception of "earnings from services performed by [a] . . . debtor after the commencement of the case," property of the estate includes the "[p]roceeds, product, offspring, rents, or profits" derived from property of the estate.   11 U.S.C. § 541(a)(6).   This section expands the definition of property of the estate to include certain property interests acquired post-petition. *E.g., In re Taronji*, 174 B.R. 964, 969 (Bankr. N.D. Ill. 1994).   This expansion is vast.   "Like the general estate definition of Section 541(a), the scope of the 'proceeds, product, offspring, rents, or profits' clause in Section 541(a)(6) is quite broad . . . encompassing any conversion in the form of property of the estate, and anything of value generated by property of the estate." *Id.*   In fact, it is sufficiently broad to include the post-petition profits that stem from the pre-petition contractual rights.   By operation of § 541(a)(6), where mineral rights are included as property of a bankruptcy estate, the oil and gas lease, "and any payments received or to be received thereon, constitutes property of the estate" and must be turned over to the bankruptcy trustee. *In re Howard*, 422 B.R. 568, 582 (Bankr. W.D. Pa. 2009) *aff'd,* 2011 WL 578777 (W.D. Pa. Feb. 9, 2011).

The Court agrees with the trustee that the debtors are "conflating income from an asset such as a working interest, which is property of the estate, and income from personal services following commencement of their Chapter 7 case, which is not estate property."   Trustee's Brief, document 61, at 1.   While arguing that profits are excepted income, the debtors have provided no evidence, argument or authority to show that Mr. Johnson's share of the oil or the oil profits have resulted from either debtor's efforts performed after the case was filed.   Nothing in the record supports the notion that Mr. Johnson is anything more than a passive investor in the well.   There

is no claim that Mrs. Johnson has provided any services related to the well.  As a result, the profits received post-petition do not fall within the exception carved out in § 541(a)(6).

The debtors' next argument related to the oil and gas profits is that these funds were treated as income in their past chapter 13 case (BK 12-40729) and should be accorded the same treatment in the instant case.  This is the full extent of the debtors' argument and the Court finds it to be without merit.   As a starting point, the Court should not be tasked with the burden of trying to ferret out and build an argument for the debtors.  The debtors have failed to advance any theory to explain why they should prevail in this argument or to provide supporting facts from the chapter 13 case.   One fact that the Court finds significant is that the debtors did not have a confirmed plan when their chapter 13 case was dismissed.  Therefore, even if the Court accepts as accurate debtors' description of the past treatment, there was no judicial approval of their retention of the funds as income that would be binding in the instant case.

 The debtors also raise an equitable case for retention of the oil and gas interest.  The Court will address their equitable arguments below.

<u>Johnson Farm Trust</u>

The bankruptcy trustee seeks turnover of the Johnson Farm Trust (Trust) whose corpus is farm land in Goreville, Illinois.  The bankruptcy trustee contends that the Trust is property of the bankruptcy estate because the bankruptcy trustee is authorized to exercise Jerry Johnson's retained power to revoke this self-settled trust of which he is a beneficiary.  The debtors state that they have no case authority to counter the bankruptcy trustee's position.  Similarly, they point to no provisions of the Bankruptcy Code to assist the Court in discerning what their arguments might be.  Rather, they assert that "by necessity . . . equity should rule the day . . . ." Debtors'

Brief, document 65, at 1.  Then, without explaining their significance, the debtors make the following statements:

> The only major and active creditor in this cause is American Wholesaler, Inc. It was a former supplier to Debtor's former business. It refused a good faith, substantial offer for Debtor's business property so that it could then obtain the property through foreclosure sale after it convinced this Court to lift the automatic stay for the purpose of having a State Court foreclosure sale rather than a sale managed by this Court. Said creditor then obtained the property for less than the private sale offering price.

> This Johnson Farm Trust was created on June 7, 2001, and there is no evidence it was created to defeat the rights of any creditor. It was created for the benefit of Debtors' children, Kevin Johnson, Brian Johnson, Kim Tebbe, and Marci Tripp, pursuant to Section 5(b) of the Trust. Turnover to the Trustee defeats the purpose of the trust and the expectation of the Debtors' children.

*Id.* at 1-2.

The following facts are not in dispute with regard to the Johnson Farm Trust.  On June 7, 2001, Jerry R. Johnson, as "Settlor,"[7] executed the Declaration of Johnson Farm Trust (Declaration) pursuant to which he continues to hold and administer as trustee[8] the 51 acres "more or less"[9] conveyed into the Trust.  The Declaration states in pertinent part:

> FIRST:  As long as I am acting as trustee I shall have power to withdraw any part or all of the net income and principal of the trust.  Any net income not withdrawn shall be added to the principal.
> SECOND:  In the event that I become unable to properly to [sic] manage my financial affairs or upon my death, my wife, DARLA JOHNSON, shall become the trustee in my place.
> THIRD:  If I am not trustee, the trustee shall distribute so much of the net income and principal of the trust as the trustee believes desirable for the support, comfort, companionship, enjoyment, and medical care of my wife, DARLA

---

[7] On the signature page of the Declaration of Johnson Farm Trust, Jerry Johnson signed the document as "Jerry R. Johnson, Settlor."

[8] The bankruptcy trustee indicates that Jerry Johnson remains the trustee of the Trust post-petition and the debtors have not disputed that assertion.   Darla Johnson, the joint debtor, is the successor trustee in the event that Jerry Johnson cannot fulfill this function or dies.

[9] On their schedule of real property, Schedule A, the debtors describe the property as 53 acres of farm land being held in trust for four children.  A legal description of the farm land is attached to the Declaration.

> JOHNSON, and me, taking into consideration other resources known to the trustee, and shall add to principal any net income not applied for such purposes.
> . . . .
> EIGHTH:  I shall have the right from time to time during my life, by written instrument delivered to the trustee, to amend or revoke this agreement . . . .  If this agreement is revoked, the policies held in trust and all other assets constituting a part of the trust estate shall be delivered to me or on my order.

The Declaration further provides that upon the death of Jerry Johnson, if his wife, Darla Johnson, survives him, certain Trust property will be held in a separate "Marital Trust" for the benefit of Darla Johnson and certain Trust property will be transferred to the "Family Trust" to be used for the support of Darla Johnson.  Upon the death of Darla Johnson, the trustee will distribute the principal and any accrued income in the Marital Trust to the Family Trust.   The debtors rely on section 5B of the Declaration in arguing that the Trust was created for the benefit of the debtors' children.   Section 5B addresses the termination of the Family Trust and states in pertinent part:

> FIFTH:  The Family Trust shall be administered as follows:
> . . . .
> B.  Upon the death of my wife, or upon my death if she fails to survive me, the Family Trust shall terminate and the then principal and any accrued or undistributed net income thereof shall be divided in equal shares to my children . . . .

Based on the provisions of the Declaration set forth above, Jerry Johnson, the settlor of the Johnson Farm Trust, retains the powers to amend or revoke the Trust throughout his lifetime.  As long as he remains trustee, Jerry Johnson has the power to withdraw any or all of the Trust income and principal, making him a beneficiary of the Trust.  When Jerry Johnson is no longer trustee, because of incapacity or death, Darla Johnson shall be the successor trustee.  Any successor trustee is to apply the net income and principal of the Trust as "desirable for the support, comfort, companionship, enjoyment, and medical care of . . . Darla Johnson and [Jerry Johnson]" making them joint beneficiaries of the Trust.  The debtors' children have a remainder

interest in the farm land now comprising the Johnson Farm Trust corpus because they are to receive that property when the Family Trust terminates upon the death of both debtors.

The debtors have not disputed that Jerry Johnson is the settlor of the Trust, one of its beneficiaries, and the trustee at all times relevant to this decision.  Therefore, the Court need not analyze further the nature of the debtors' interests in the Trust under state law and turns now to the question of whether the Trust corpus is property of the bankruptcy estate.

As discussed previously, pursuant to 11 U.S.C. §541(a)(1), property of the bankruptcy estate includes all legal and equitable interests of debtors in property as of the commencement of the bankruptcy case unless those interests are excepted under subsections 541(b) or (c)(2).[10] Property of the estate has been held to include "[a]ny interest which a debtor retains in a trust . . . , including the power to amend the trust and the power to revoke a revocable trust."   *In re Reuter*, 499 B.R. 655, 670 (Bankr. W.D. Mo. 2013).   Therefore, "what comes into the bankruptcy estate is not only the property in which debtor has an interest, but also, the powers the debtor can exercise for its benefit over property, regardless of the title debtor may be acting under." *Matter of Gifford*, 93 B.R. 636, 640 (Bankr. N.D. Ind. 1988).  In the instant case, since Jerry Johnson reserved for himself the powers to amend and to revoke the Trust, ensuring return of its corpus to his ownership upon demand, the chapter 7 trustee obtained those rights derivatively on the date the bankruptcy case was filed.  *In re Reuter*, 499 B.R. at 670.

---

[10] Section 541(c)(2) excludes from the bankruptcy estate an interest of the debtor-beneficiary in a spendthrift trust. *E.g.*, 5 *Collier on Bankruptcy* ¶ 541.27, at 541-102  (16th ed. 2014).  The debtors have not argued that this section is applicable to their case although the Trust contains a spendthrift clause in section 5D dealing with the Family Trust administration.  Neither party has briefed the issue.  The Court notes only that had the debtors raised this argument, it is doubtful that they would have prevailed.  Despite the inclusion of a valid spendthrift clause in a trust, if the debtor has the power to amend or terminate the trust, the spendthrift aspect is destroyed and all rights of the debtor under the trust become property of the bankruptcy estate. *Id.*

Moreover, the powers granted Jerry Johnson under the Declaration are not protected from the bankruptcy trustee's reach by subsection 541(b)(1) of the Bankruptcy Code.  This subsection removes from property of the estate "[a]ny power that the debtor may exercise solely for the benefit of an entity other than the debtor."  11 U.S.C. §541(b)(1).  By implication, powers that a debtor may exercise for his own benefit are included in the bankruptcy estate.  *E.g., In re Marrama*, 316 B.R. 418, 423 (1st Cir. BAP 2004); *In re Reuter*, 499 B.R. at 670.  *See also 5 Collier on Bankruptcy* ¶ 541.17, at 541-86 ("[I]f the power in question may be exercised for the benefit of another entity, but is capable of conferring benefit on the debtor also, it becomes property of the estate").  While it is possible[11] that the debtors are seeking the protection of this subsection when they state that the Trust was created for the benefit of the debtors' children, the children are not the sole, or even the primary beneficiaries of the Trust.  Jerry Johnson's power as trustee "to withdraw any part or all of the net income and principal of the trust" and his power as settlor to revoke the Declaration and to receive the entire Trust corpus, are powers that he may exercise for his own benefit as a beneficiary of the Trust.[12]  These powers became property of the bankruptcy estate at the commencement of the case and the bankruptcy trustee may exercise these powers because they are not solely for the benefit of a non-debtor.

Equitable Arguments

The debtors contend that "equity should rule the day in the instant case."  Debtors' Brief, document  65, at 1.  In support of this position, the debtors invoke descriptions of their advanced age and poor health, of their meager financial condition and of the Court-sanctioned loss of real

---

[11] The Court must engage in speculation because the debtors have not cited even so much as a Bankruptcy Code section in support of their argument.

[12] Darla Johnson's power as successor trustee to use the net income and principal for the needs and enjoyment of both debtors is further evidence that a primary purpose of the Trust is to provide financially for Jerry and Darla Johnson.

14

estate to foreclosure during their chapter 13 case.[13]  They also may be arguing that they have clean hands in that the Trust was created, not to defeat the rights of creditors, but to benefit their children.  In this regard, they assert that the purpose of the Trust would be lost if the Court were to rule in favor of the bankruptcy trustee.

In the recent case of *Law v. Siegel*, ___ U.S. ___, 134 S. Ct. 1188, 1194-95 (2014), the Supreme Court of the United States restated the boundaries within which the Bankruptcy Courts must operate.  There, in speaking of the equitable authority granted under 11 U.S.C. § 105(a), the Supreme Court said:

> A bankruptcy court has statutory authority to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code.  11 U.S.C. § 105(a).  And it may also possess 'inherent power . . . to sanction 'abusive litigation practices.''  But in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.

> It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'  2 *Collier on Bankruptcy* ¶ 105.01[2], p. 105–6 (16th ed. 2013). Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere. . . . We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.

134 S. Ct. at 1194-95 (citations and footnote omitted).

In the instant case, although the Court has sympathy for the debtors' financial and health problems, it is not free to disregard legal provisions under § 541 that define the property of their bankruptcy estate.  The Court notes, too, that the debtors' bankruptcy filing was a voluntary act.

---

[13] The debtors assert that after the Bankruptcy Court lifted the automatic stay in their chapter 13 case, rather than permitting the "orderly sale" of their real estate through the chapter 13 plan, the moving creditor foreclosed on their commercial real estate and purchased the real estate "for a small fraction of what had been offered to purchase that property.  The Creditor walked away with the property and with a deficiency judgment of [sic] far in excess of their original debt.  In a word, this had a very bad aroma."  Debtors' Brief, document 60, at 2.

"Having availed [themselves] of the protections and privileges afforded by the Bankruptcy Code, the debtor[s] cannot complain about the limits imposed by its provisions." *In re Simpson*, No. 99-40141, at 9 (Bankr. S.D. Ill. Aug. 26, 1999).

For the reasons stated, the debtors must turn over to the trustee all indicia of ownership (not already produced) of the $^{11}/_{32}$ working interest described on Schedule B along with all profits received by Jerry Johnson on account of the $^{11}/_{32}$ working interest from and after commencement of their chapter 7 case.   Further, they must turn over to the trustee all property subject to the Johnson Farm Trust and all documents (not already produced) relating to the Johnson Farm Trust.

ENTERED: July 2, 2014

/s/ Kenneth J. Meyers
UNITED STATES BANKRUPTCY JUDGE